IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>        *Plaintiff,*<br><br>    v.<br><br>REAL PROPERTY KNOWN AS 2291 FERNDOWN LANE, KESWICK VA 22947-9195<br>        *Defendant.* | CIVIL ACTION NO. 3:10-CV-0037<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This is a civil forfeiture action arising under 18 U.S.C. §§ 981(a)(1)(A) – (a)(1)(C). The claimant, Avallo Ltd. ("Avallo" or "Claimant"), a British Virgin Islands company, is the owner of Pegasus Virginia, LLC ("Pegasus"), the holder of title to the defendant property.[1] Avallo now moves to dismiss pursuant to Rule 12(b)(6) (docket no. 14), alleging that as a matter of Taiwanese law, the funds used to purchase the subject property are not traceable to unlawful conduct; the factual allegations set forth in the complaint are inadequate; and the statute defining the predicate offense to the forfeiture is unconstitutionally vague. For the reasons given herein, I will grant the motion as to claims one and four of the complaint, and deny the motion in all other respects.

I.

The government alleges[2] that in December 2009, the Taiwan Special Prosecutor's Office indicted Chen Shui-Bian, the former president of Taiwan; Wu Sue-Jen, the former first lady;

---

[1] There is no dispute that Avallo is a proper party to this action.
[2] In considering a motion to dismiss, the court must view the factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Chen Chih-Chung, their son; Huang Jui-Ching, Chen Chih-Chung's wife; and others, for crimes involving corruption and money laundering in violation of Article 9.1 of Taiwan's Money Laundering Control Act. The indictment alleged that Yuanta Securities Co. Ltd. ("Yuanta"), paid the first lady a bribe in the amount of $200 million New Taiwan Dollars ("TWD"), or approximately $6 million U.S. dollars ("USD"), to establish a relationship with the head of government, and secure the government's non-interference in Yuanta's attempt to increase its ownership in Fuhwa Financial Holding Company Limited ("Fuhwa").

According to Yuanta Chief Executive Officer Ma Wei-Chien, it was "common knowledge" that if government "help" were needed in such transactions, "one must get consent from Madam," meaning the first lady. He therefore asked Yuanta director Tu Li-Ping to make overtures to the first lady concerning the acquisition. Tu Li-Ping advised him that the "on-going rate" was TWD $200 million, to be delivered to the president's official residence. Such payment was delivered in cash, stored in several fruit boxes.

The first lady has acknowledged that cash received as "political contributions," including the payments from Yuanta, was stored in vaults at Cathay United Bank in Taipei. In furtherance of her desire to keep the vault lease confidential, all incidental paperwork was put in her sister-in-law's name. The Cashier in the Office of the President of Taiwan, Chen Chen-Hui, told prosecutors that she was required to make cash deliveries to the vault, and report the cash on hand to first lady. At one point, the vault contained in excess of TWD $1.1 billion, or approximately USD $34.38 million.

After Taiwan's 2004 presidential election, Wu Sue-Jen asked Tu Li-Ping to relocate the money "because several persons had learned about the money and its location." Tu Li-Ping advised the first lady that space was available in a basement vault in Ma Wei-Chien's private

residence. At the direction of the first lady, Ma Wei-Chien, Tu Li-Ping, and others moved several suitcases of cash, totaling approximately TWD $700 million, from the bank to the basement vault.[3]

After several months, communicating through Tu Li-Ping, Wu Sue-Jen told Ma Wei-Chien that she wished to move the cash into the banking system because she feared that the money could be traced to the vault. Moreover, she wished to make overseas investments. She therefore directed Ma Wei-Chen to send TWD $540 million overseas for that purpose. Given concerns about being investigated by Taiwanese authorities, Ma Wei-Chien structured the transaction to avoid wiring any funds back into Taiwan. First, he established Asian Piston Investment Limited, a British Virgin Islands company, ("Asian Piston") on the first lady's behalf, listing himself, his mother, and Tu Li-Ping, as officers and directors. Then, he moved funds from his personal overseas accounts to Asian Piston. Finally, he recouped the money by making daily withdrawals from the cash in his basement vault.

Several months later, Tu Li-Ping instructed Ma Wei-Chien to transfer USD $10 million into an account in the name of Avallo at Wegelin & Company Private Bankers, in Switzerland. As the Asian Piston account lacked sufficient funds, he effected the exchange by transferring funds from one of his personal accounts at a Hong Kong bank to the Avallo account. In August 2007, Wu Sue-Jen, through Tu Li-Ping, instructed Ma Wei-Chien to transfer the balance of funds from Asian Piston to Avallo. By September 2007, he had transferred approximately USD $7.57 million.

On or about December 17, 2007, Avallo transferred USD $17.5 million from its account to an account owned by Bravo International Holdings, an Island of Nevis company ("Bravo").

---

[3] On Feburary 2, 2010, Ma Wei-Chien and Tu Li-Ping plead guilty to money laundering in connection with moving the cash.

Chen Chih-Chung had sole signature authority over the accounts of both Bravo and Avallo. In May and June 2008, Bravo made two transfers totaling approximately USD $2 million from its account to the trust account of the Mitchell S. Polansky, Esq. ("Polansky), an attorney for Seuss & Partners, LLC ("Seuss & Partners"), in Miami, Florida. Chen Chi-Chung and his wife had retained Seuss & Partners in or around spring of 2008 to assist in the acquisition of real estate in New York and Virginia. They had directed the company to conceal their ownership in such properties. To facilitate the purchase and management of the defendant property, Seuss & Partners created Pegasus Virginia LLC, a wholly owned subsidiary of Avallo. On June 26, 2008, Pegasus used funds withdrawn from Polansky's trust account to acquire the defendant property for USD $550,000.

In summary, the complaint alleges that the funds used to purchase the defendant property can be traced from Polansky's trust account, to Bravo and Avallo accounts controlled by Chen Chi-Chung, to the Asian Piston account managed by Ma Wei-Chien, and ultimately to cash payments made to Wu Sue-Jen, in exchange for the government's goodwill and non-interference in the Yuanta acquisition.

## II.

In *in rem* actions for forfeiture, both the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") are applicable. *See United States v. $85,000.00 in U.S. Currency,* No. WDQ-10-0371, 2011 WL 1063295, at *1 (D. Md. Mar. 21, 2011). However, the former only apply to the extent they are consistent with the Supplemental Rules. Supp. R. (G)(1). If a party establishes standing to contest a forfeiture action, it may move to dismiss pursuant to Rule 12(b)(6). Supp. R. (G)(8)(b)(i). In such cases, the sufficiency of the complaint is governed by

the requirements of Supplemental Rule G(2). Supp. R. G(8)(b)(ii). That is, the complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. G(2)(f). For the government to prevail, it must show by a preponderance of the evidence that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c).

The complaint sets forth six theories of forfeiture. Claims one, two, and three arise under 18 U.S.C. § 981(a)(1)(A); claim four arises under § 981(a)(1)(B); and claims five and six arise under § 981(a)(1)(C). In essence, each of the provisions allows for the forfeiture of property that was involved in, constitutes the proceeds of, or is derived from proceeds traceable to criminal activity in violation of 18 U.S.C. §§ 1956 and 1957. Under each claim, the government seeks to prevail by showing the property had some connection with "specified unlawful activity," which for all relevant purposes means "with respect to a financial transaction occurring in the United States, an offense against a foreign nation involving . . . bribery of a public official. . . ." 18 U.S.C. § 1956(c)(7)(B)(iv).

**A.**

On November 5, 2010, a Taipei District Court issued a decision acquitting the former president, his wife, son, daughter-in-law, and others, of charges relating to the alleged Yuanta bribe. Among other things, the court found that since the payment did "not involve anything that has something to do with the presidential duties at law, it is absolutely certain that the . . . cash payment does not constitute a 'bribe' as defined in the Criminal Code or the Corruption Punishment Statute."[4] Furthermore, as the payment did not "constitute a property which

---

[4] Quotations are from a partial English translation of the opinion. Br. in Supp. Mtn. to Dismiss Ex. 3.

Defendant Chen Shui-[B]ian and Defendant Wu Shu-chen[5] have obtained from [the] commitment of [a] felony . . . the Money Laundering Prevention and Control Act [does] not apply." The decision is now on appeal in Taiwan.

In light of the acquittal, Claimant contends that the government cannot show the requisite nexus between the defendant property and "an offense against a foreign nation involving . . . bribery of a public official." 18 U.S.C. § 1956(c)(7)(B)(iv). The government asks that the court disregard the Taipei decision, asserting (1) that the court may not consider extrinsic evidence at this stage in the litigation; (2) that a criminal conviction is not a necessary predicate to civil forfeiture; and (3) that the opinion proffered has "no evidentiary value" under *United States v. Diaz*, 519 F.3d 56, 64 (1st Cir. 2008) (stating the general rule that foreign language documents must be translated before consideration by the court).

I decline to defer to the Taipei District Court, albeit for reasons different from those argued by the government.[6] First, I note that the court is not bound to follow a foreign judgment. Neither the full faith and credit statute, 28 U.S.C. § 1738, nor the Full Faith and Credit Clause of the Constitution, imposes such a requirement. *Jaffe v. Accredited Surety and Cas. Co.*, 294 F.3d 584, 591 (4th Cir. 2002); *Andes v. Versant Corp.*, 878 F.2d 147, 149 (4th Cir. 1989). Although

---

[5] From the context, it is clear that "Wu Shu-chen" is an alternate transliteration of "Wu Sue-Jen," the first lady.
[6] A determination of foreign law is a question of law, which may appropriately be adjudicated at the motion to dismiss stage. *See* Fed. R. Civ. P. 44.1. Moreover, *Diaz* is inapposite because Avallo has provided a translation of the decision, and the Federal Rules of Civil Procedure specifically allow a court to consider "any relevant material or source" in determining foreign law "whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1 Finally, while courts have held that an acquittal in a criminal proceeding ordinarily does not preclude civil forfeiture, those decisions turn on the different standard of proof in such proceedings. *See One Lot Emerald Cut Stones and One Ring v. United States*, 409 U.S. 232, 234-235 (1972), *United States v. Cherry*, 330 F.3d 658, 669 n.16 (4th Cir. 2003). That is, a fact that is not established beyond a reasonable doubt may well be established by a preponderance of the evidence. Here, the Taipei court's decision did not turn on factual determinations that might be resolved differently under the preponderance of the evidence standard required under 18 U.S.C. § 983(c). Rather, the court determined that the alleged cash payment to Wu Sue-Jen was not a bribe under Taiwanese law, since "handling the merger of financial institutions" was not among the president's official duties.

principles of comity ordinarily suggest deference to foreign decisions, *Haxhiaj v. Hackman*, 528 F.3d 282, 284-85 (4th Cir. 2008), the Supreme Court has described comity as the practice "among most civilized states, by which the *final judgments* of foreign courts of competent jurisdiction are reciprocally carried into execution . . . ." *Hilton v. Guyot*, 158 U.S. 113, 166 (1895) (emphasis added) (quotation omitted). The Taiwanese courts have not yet issued a final judgment as to the alleged bribery.

Moreover, in determining foreign law, a court may ordinarily consider a wide range of sources, including affidavits and expert testimony. *See United States v. Mitchell*, 985 F.2d 1275, 1280 (4th Cir. 1993). As I have not yet had the benefit of considering full briefing, evidence, and argument on the law of Taiwan, it is appropriate to delay a determination of the requirements of "specified unlawful activity" until such matters are brought before the court. For purposes of Supplemental Rule G(2)(f), it is sufficient that the former president and others have been indicted under Taiwan's Money Laundering Control Act.

**B.**

Claimant contends that it is not clear whether "bribery of a public official," as used in the definition of "specified unlawful activity," 18 U.S.C. § 1956(c)(7)(B)(iv), is determined under foreign or United States law. If the former, Claimant argues that the matter has been decided by the Taipei District Court. (See Part A, *supra*). If the latter, Claimant suggests that the government's claim is foreclosed because the alleged facts do not show a violation of the federal bribery statute, 18 U.S.C. § 201 *et seq.* However, there is no ambiguity in the law. For all presently relevant purposes, "specified unlawful activity" requires an "offense against a foreign

7

nation." 18 U.S.C. § 1956(c)(7)(B)(iv). Therefore, the federal bribery statute has no bearing on the determination of "specified unlawful activity."

Nonetheless, the bribery statute is not irrelevant to this case. To prevail on claim four, the government must show, *inter alia*, that the defendant property was purchased with proceeds derived from an offense against a foreign nation, which has an analogous offense punishable in the United States by death, or a term of imprisonment exceeding one year. 18 U.S.C. § 981(a)(1)(B)(ii). However, the complaint fails to set forth what particular statute provides the basis for the government's assertion that this requirement is satisfied. *See* Compl. ¶ 41. Moreover, the facts alleged would not support a conviction under the most directly relevant law, the federal bribery statute. In essence, the law prohibits payments to a "public official" if intended to influence a specific "official act,"[7] induce fraudulent behavior, or encourage some other violation of lawful duties. 18 U.S.C. § 201(b); *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 406 (1999). Here, the government merely alleges that Yuanta intended to develop goodwill with the ruling party, and secure the government's non-interference in a merger. However, a general desire to curry favor is insufficient under the statute. *See* 526 U.S. at 406. Moreover, nothing in the complaint suggests that the former president, first lady, or other members of the first family had any official role in the Yuanta merger.

Similarly, the complaint fails to implicate a "public official" in the alleged bribery. A public official is "an officer or employee or person acting for or on behalf of the [government] . . . in any official function . . . ." 18 U.S.C. § 201(a). Although the complaint alleges malfeasance on the part of the first lady, and others, it does not show Chen Shui-Bian's involvement in any

---

[7] An "official act" is "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity . . . ." 18 U.S.C. § 201(a)(3).

8

wrongdoing. Nor does the conclusory and unadorned allegation that the former president was involved in money laundering save the claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Francis v. Giacomelli,* 588 F.3d 186, 195 (4th Cir. 2009). Finally, while a member of the first family might be considered a "public official" if acting on behalf of the government "in any official function," the complaint does not allege any facts that would support such a conclusion.

Therefore, I will grant the motion to dismiss with respect to claim four of the complaint.

## C.

Claimant argues that since the alleged bribery was wholly extraterritorial to the United States, the statutory definition of "specified unlawful activity" cannot be satisfied, and all six claims must be dismissed. However, Claimant misreads the statute. As noted, for relevant purposes, "specified unlawful activity" means, "with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving . . . bribery of a public official. . . ." 18 U.S.C. § 1956(c)(7)(B)(iv). Thus, nothing in the language of the statute requires the conduct constituting the "offense against a foreign nation" to occur in the United States. It merely requires that the offense occur "with respect to a financial transaction" in the United States. *Id.*

The import of this geographical limitation becomes clear upon consideration of the statute as a whole. In essence, § 1956 criminalizes money laundering "transaction[s]" or "transfer[s]" that are intended to conceal "the proceeds of specified unlawful activity." 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i). It is in this sense that the word "transaction" is used in § 1956(c)(7)(B)(iv). Thus, the geographical limitation applies not to the locus of the initial

offense conduct (here, bribery), but to the locus of the transaction designed to conceal the proceeds of such conduct. To find otherwise would be inconsistent with the language of the statute, and would frustrate the Congressional objective to "criminalize the use of United States financial institutions as clearinghouses for criminal money laundering." *United States v. All Assets Held at Bank Julius Baer & Company, Ltd.*, 571 F. Supp. 2d 1, 12 (D.D.C. 2008).

Therefore, it is evident that the factual allegations concerning a transaction occurring in whole or part in the United States are sufficient for purposes of Supplemental Rule G(2)(f). "[F]inancial transactions" include "the movement of funds by wire or other means," and transactions "involving the transfer of title to any real property. . . ." 18 U.S.C. §§ 1956(c)(4)(A)(i), (iii). As the government has alleged that Bravo transferred illicit funds to the trust account of Mitchell S. Polansky Esq., and that such funds were used to purchase the defendant property, the allegations set forth in the complaint satisfy the geographical limitation of 18 U.S.C. § 1956(c)(7)(B)(iv).

**D.**

Avallo also contends that claims one, two and six must be dismissed because the government fails to allege that illicit funds were transferred to the United States, or that the defendant property was purchased, with intent to conceal the proceeds of specified unlawful activity. *See* 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i). However, the government may prevail on claim six without such a showing, because it relies in part on § 1957, which has no concealment requirement. *United States v. Wetherald*, 636 F.3d 1315, 1324 n.2 (11th Cir. 2011); *United States v. Ghilarducci*, 480 F.3d 542. 551 (7th Cir. 2007); *United States v. Wynn*, 61 F.3d 921, 926-27 (D.C. Cir. 1995). Section 1957 merely requires that the government prove the

existence of a "monetary transaction," or attempt to engage in a monetary transaction, "in criminally derived property of a value greater than $10,000." 18 U.S.C. § 1957(a). Accordingly, to the extent the government seeks to rely on § 1957, Avallo's argument as to claim six is unavailing.

Under claim one, the government seeks to show that the property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because it constitutes property traceable to a violation of 18 U.S.C. § 1956(a)(1)(B). Section 1956(a)(1)(B) requires, among other things, a transaction – here, the purchase of the defendant property – "designed in whole or part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." The Supreme Court has explained that the phrase, "designed in whole or in part to conceal" as used in the money laundering statute[8] "requires proof that the purpose – not merely the effect – of the [transaction] was to conceal or disguise a listed attribute." *Regalado Cuellar v. United States*, 553 U.S. 550, 567 (2008). However, Avallo rightfully objects that the complaint does not even include a conclusory recital of the elements of § 1956(a)(1)(B). Nowhere in claim one does the government allege that the purchase of the defendant property was consummated *in order to* conceal the source of illicit funds. It merely states that Wu Sue-Jen and others "took steps to conceal the ownership and source of the funds used to purchase the property." Compl. ¶ 35. Therefore, I will grant the motion to dismiss with respect to claim one.

Under claim two, the government seeks to show that the property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because it constitutes property traceable to a violation of

---

[8] While the Supreme Court only addressed § 1956(a)(2)(B)(i), the court's reasoning applies equally well to the identical language of § 1956(a)(1)(B)(i).

18 U.S.C. § 1956(a)(2)(b). Section 1956(a)(2)(B) requires, among other things, a "transmission, or transfer" of funds – here, the transfer of funds to the trust account of Mitchell S. Polansky, Esq. – "to conceal or disguise . . . the proceeds of specified unlawful activity." Avallo contends that claim two suffers from the same defect as claim one. However, claim two contains the allegation that "funds used to purchase the defendant property were transmitted to a place in the United States" and that "the transfer was designed in whole or part to conceal . . . the ownership, or the control of illicit funds." Compl. ¶ 37.

Standing alone, this statement might be considered the sort of conclusory allegation that merits dismissal. *See Twombly*, 550 U.S. at 555; *Giacomelli,* 588 F.3d at 195. However, the complaint is replete with factual embellishment that lends weight to the allegations of claim two. As described in detail in part I above, the complaint traces the money used to purchase the defendant property back to the alleged Yuanta bribe. Moreover, it provides various allegations that suggest the transfer of funds was merely the last of many steps in a concerted effort to conceal their source. Wu Sue-Jen initially stored the funds acquired from Yuanta in a vault leased under her sister-in-law's name. Compl. ¶ 16. She required the bank to keep the vault lease confidential. Compl. ¶ 16. The funds were moved to a private vault in Taiwan to conceal their existence and location. Compl. ¶ 21. Two individuals pleaded guilty to money laundering in Taiwan for participating in moving the cash. Compl. ¶ 24. Wu Sue-Jen directed that the cash be placed in the international banking system "because she feared that the money could be traced . . . ." Compl. ¶ 25. The funds were exchanged with funds on deposit in Hong Kong and transferred to a Swiss bank account in the name of Avallo, under the sole control of Chen Chih-Chung. ¶¶ 26-27. The funds were then transferred to another Swiss bank account. Compl. ¶¶ 28-29. Finally, Chen Chih-Chung and his wife had a financial manager establish an LLC within an

12

offshore trust for their United States real estate holdings, so that they could own the defendant property "while concealing their ownership . . . ." Compl. ¶ 31. In light of the foregoing, the allegations support a reasonable belief that the government can show the requisite intent to conceal as to claim two.

**E.**

"To satisfy due process, 'a penal statute[9] [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 130 S.Ct. 2896, 2927 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "The void-for-vagueness doctrine embraces these requirements." *Id.* at 2928. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). Therefore, the Supreme Court has struck down statutes that "tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent' – wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.*

In considering whether a statute is unconstitutionally vague, courts must be aware of the "strong presumptive validity that attaches to an Act of Congress." *United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Accordingly, district judges should generally attempt to "construe, not condemn, Congress' enactments." *Skilling*, 130 S.Ct. at 2927. "[E]very

---

[9] A statute "whether labeled 'penal' or not must meet the challenge that it is unconstitutionally vague." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966)

13

*reasonable construction* must be resorted to, in order to save a statute from unconstitutionality." *Skilling*, 130 S.Ct. at 2929 (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)).

Avallo claims that the definition of "specified unlawful activity" put forth in 18 U.S.C. § 1956(c)(7)(B)(iv) is unconstitutionally vague because it uses four terms or phrases that are unclear. First, it contends that the phrase "offense against a foreign nation" fails to apprise potential defendants of whether the statute requires a criminal conviction, a civil conviction, or whether it is sufficient that the foreign nation be a "victim of some wrongful conduct." However, it is well established that civil forfeiture may apply even absent a conviction for an underlying crime. *See One Lot Emerald Cut Stones*, 409 U.S. at 234-235. Moreover, that the government must prove the relevant facts by a preponderance of the evidence is plain on the face of the statute. 18 U.S.C. § 983(c). Finally, while the statutory language is arguably susceptible of a reading that stretches its applicability to any "wrongful conduct" against a foreign nation, a better reading of the word "offense" is to treat it as limited to criminal conduct. "[S]pecified unlawful activity" also includes "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1);" a "continuing criminal enterprise[s];" any "offense under section 32 . . . section 37 . . . section 115" and numerous other provisions of Title 18, "Crimes and Criminal Procedure." 18 U.S.C. §§ 1956(c)(7)(A) – (D). These repeated references to criminal conduct suggest that "offense" as used in § 1956(c)(7)(B)(iv) likewise refers to criminal conduct.

Second, Avallo claims that it is not clear whether "bribery of a public official" is measured under United States law, or the law of some other nation. As discussed above, because the statute plainly refers to an "offense against a foreign nation," 18 U.S.C. § 1956(c)(7)(B)(iv), Avallo's claim is without merit. Third, Avallo argues that the word "involving" – as in "involving bribery of a public official" – is unclear. However, an ordinary person would surmise

14

that whatever the breadth of the term, it at least implicates the offense conduct included in the foreign nation's definition of bribery.

Finally, Avallo claims that the phrase "financial transaction occurring in whole or in part in the United States," is vague. But the statute explicitly defines "financial transaction" to include "the movement of funds by wire or other means," such as the alleged wire transfer to the trust account of Mitchell S. Polansky, Esq, and transactions "involving the transfer of title to any real property," such as the purchase of the defendant property. 18 U.S.C. §§ 1956(c)(4)(A)(i), (iii). These definitions are not at all like the "wholly subjective" standards that the vagueness doctrine is meant to address. *Williams*, 553 U.S. at 306

### III.

For the foregoing reasons, I will grant the Claimant's motion as to claims one and four, and deny it as to the remaining claims. To the extent the government wishes to amend its complaint to address the defects identified herein, it will have 14 days to do so.

The Clerk of the Court is directed to send a certified copy of this opinion and the accompanying order to all counsel of record.

Entered this __14th__ day of June, 2011.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE